**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**James Lee Rouse, Jr.,**

    **Plaintiff,**

**v.**

**Nationwide Mutual Insurance Co.,**
**et al.,**

    **Defendants.**

**Case No. 2:21-cv-4833**

**Judge Michael H. Watson**

**Magistrate Judge Vascura**

## OPINION AND ORDER

Defendants Nationwide Mutual Insurance Co., *et al.* ("Nationwide") move for judgment on the pleadings as to James Lee Rouse Jr.'s ("Plaintiff") claim for breach of contract. Mot. ECF No. 29. Nationwide further moves for judgment on the pleadings as to its counterclaim for declaratory judgment that it does not owe Plaintiff any additional payments under the at-issue contract and as to its counterclaim for attorney's fees. *Id.* Plaintiff cross-moves for judgment on the pleadings as to only Nationwide's counterclaim for attorney's fees and opposes Nationwide's motion for judgment on the pleadings as to Plaintiff's breach of contract claim and Nationwide's counterclaim for declaratory judgment. Resp. 2, ECF No. 32. For the following reasons, Nationwide's motion for judgment on the pleadings is **DENIED**. Plaintiff's cross-motion for judgment on the pleadings as to Nationwide's counterclaim for attorneys' fees is likewise **DENIED**.

## I.     FACTS

Plaintiff began working as an agent for Nationwide in March 2011. Compl. ¶¶ 6–7, ECF No. 1. Plaintiff signed four agreements during his employment that are relevant to this dispute.

First, in March 2011, Plaintiff signed an agreement through Nationwide's Replacement Agency Executive Program (the "RAE Agreement"). *Id.* ¶ 7; RAE Agmt., ECF No. 1-1. Pursuant to the RAE Agreement, Plaintiff purchased the right to service insurance policies that were previously assigned to Agents Bennetti and Blackert (the "Bennetti Policies"). Compl. ¶ 8, ECF No. 1.

Second, in August 2011, Plaintiff signed an amendment to the RAE Agreement (the "RAE Amendment"). *Id.*; RAE Amend., ECF No. 1-3. The RAE Amendment first introduced the refund payment provision that is at the heart of this lawsuit.

Third, in late 2013, Plaintiff purchased the right to service another set of policies that were previously assigned to Agent Parsons (the "Parsons Policies"). *Id.* ¶ 11. As part of that purchase, Plaintiff signed a Policy Assignment and Service Agreement (the "PASA Agreement"). *Id.* ¶ 12; PASA Agmt., ECF No. 1-4. As is shown below, the relationship between the PASA Agreement and RAE Agreement is key.

Fourth, in May 2014, Plaintiff signed the RAE Career Independent Contractor Exclusive Agent Agreement (the "IC Agreement"). *Id.* ¶ 30; IC Agmt.,

ECF No. 1-5. The IC Agreement purported to "define the terms and conditions governing the business relationship between the parties involved." *Id.*

The portions of each Agreement relevant to this dispute are as follows:

**2011 RAE Agreement.** The RAE Agreement covers Plaintiff's right to service the Bennetti Policies, which are defined as the "Assigned Policies." RAE Agmt. ¶ 42, ECF No. 1-1. Paragraph 43(A) assigns a value of $279,254 to the right to service the Bennetti Policies. *Id.* ¶ 43. Thus, per the RAE Agreement, Plaintiff was required to pay $279,254 to Nationwide, in installments, for his right to service the Bennetti Policies. *Id.*

**2011 RAE Amendment.** The RAE Amendment replaced Paragraph 43 of the RAE Agreement in its entirety. *Id.* ¶ 13. The amended Paragraph 43 assigns a value of $244,960 for the right to service the Bennetti Policies and defined the $244,960 value as (the "Reimbursement."). *Id.*

The RAE Amendment also adds a refund payment provision to the RAE Agreement. RAE Amend. ¶ 29, ECF No. 1-3. The refund payment provision provides that if either Plaintiff or Nationwide cancels the RAE Agreement within a specified time period, Plaintiff is entitled to a "Refund Payment of 80% of all monies paid to Nationwide for the Reimbursement pursuant to Section 43(B)(1) or (2) [of the RAE Agreement]." *Id.*

So, under the RAE Agreement as amended by the RAE Amendment, if Plaintiff or Nationwide cancels the RAE Agreement during the specified time

period, Plaintiff is entitled to a refund of 80% of the amount he paid to Nationwide toward the $244,960 value of the right to service the Bennetti Policies.

**2013 PASA Agreement.** Under the PASA Agreement, Plaintiff purchased the right to service the Parsons Policies. PASA Agmt. pg. 1, ECF No. 1-4. The PASA Agreement states that it "is an adjunct" to the RAE Agreement and that the "terms and conditions stated in [the PASA Agreement and the RAE Agreement] apply to the policies assigned pursuant to [the PASA Agreement]." *Id.* The PASA Agreement defines the Parsons Policies as the "Assigned Policies" and assigns a value of $178,627.62 to the right to service the Parsons Policies. *Id.* at Article 2, pg. 2. The PASA Agreement defines this $178,627.62 value as the "Reimbursement" and provides that Plaintiff will reimburse Nationwide for the value of the Parsons Policies in installments. *Id.* The PASA Agreement does not contain a stand-alone refund payment provision.

**2014 IC Agreement.** The IC Agreement contains an integration clause which provides that the IC Agreement supersedes all prior agreements between Plaintiff and Nationwide, and the IC Agreement "constitute[s] the entire agreement between them concerning the subject matter of this Agreement." IC Agmt. ¶ 25, ECF No. 1-5. Like the amended RAE Agreement, the IC Agreement includes a refund payment provision. *Id.* ¶ 12. This refund payment provision states that "[i]f this Agreement is cancelled on or before March 31, 2019, [Plaintiff] shall be eligible to receive a Refund Payment of 80% of all monies paid

to Nationwide for the Reimbursement pursuant to [Plaintiff's RAE Agreement]." *Id.*

In 2018, Nationwide offered their insurance agents a succession option to transition away from Nationwide. *Id.* ¶ 15. Plaintiff elected this option, and his employment agreements, including the IC Agreement, were cancelled on October 31, 2018. *Id.* ¶¶ 15, 32. Because Plaintiff had made payments toward the value of the Bennetti Policies and the Parsons Polices, he alleges he was entitled to a refund payment under the IC Agreement's refund payment provision. Compl. ¶ 18, ECF No. 1. However, Nationwide provided Plaintiff a refund payment only for 80% of the amount he paid towards the Bennetti Policies' Reimbursement value. *Id.* ¶ 18. Nationwide did not provide Plaintiff any refund payment for any amount paid toward the Parsons Policies' Reimbursement value. *Id.* ¶ 19.

Plaintiff brought suit, arguing that the terms of the IC Agreement require Nationwide to pay him 80% of the value he paid for *both* the Bennetti Policies and the Parsons Policies. *Id.* ¶ 26. In its Answer, Nationwide asserted a counterclaim for declaratory judgment that it properly calculated the refund payment owed to Plaintiff, that it paid in full the refund payment owed to Plaintiff, and that it does not owe Plaintiff any additional payments. Ans. ¶¶ 24–26, ECF No. 21. Nationwide also asserted a counterclaim for attorneys' fees under the IC Agreement. *Id.* ¶¶ 29–31.

## II. STANDARD OF REVIEW

"A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) generally follows the same rules as a motion to dismiss the complaint under Rule 12(b)(6)." *Bates v. Green Farms Condominium Ass'n*, 958 F.3d 470, 480 (6th Cir. 2020) (citing *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014)). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (citing *JPMorgan Chase Bank v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citations and quotation marks omitted)).

As with a 12(b)(6) motion, a claim survives a motion for judgment on the pleadings if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). This standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [unlawful conduct]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the [pleading] are true (even if doubtful in fact)." *Id.* at 555 (internal citations omitted). The court

"must construe the complaint in the light most favorable to the [non-moving party." *Engler v. Arnold*, 862 F.3d 571, 574 (6th Cir. 2017). However, the non-moving party must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. ANALYSIS

A breach of contract claim under Ohio law—which the parties agree applies in this case—has four elements: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; (4) damage or loss to the plaintiff. *New Lansing Gardens Hous. Ltd. P'ship v. Columbus Metro. Hous. Auth.*, 46 F.4th 514, 520 (6th Cir. 2022). Only the third element, whether Nationwide breached the IC Agreement, is at issue here. Specifically, the parties dispute whether Nationwide owes Plaintiff an additional refund payment and whether, therefore, its failure to pay constitutes breach.

### A. Plaintiff's Entitlement to a Refund Payment

The Ohio Supreme Court has held that the "cardinal purpose" for a court interpreting a contract "is to ascertain and give effect to the intent of the parties." *Dore & Assocs. Contracting, Inc. v. City of Columbus*, Case No. 2:15-cv-2677, 2017 WL 5706008, at *3 (S.D. Ohio Mar. 14, 2017) (quoting *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E. 2d 519, 526 (Ohio 1997)). Under Ohio law, interpreting written contract terms is a matter

of law for initial determination by the Court. *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019).

"Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Foster*, 678 N.E. 2d at 526. "To ascertain the common meanings of terms or phrases not defined in the language of contracts, Ohio courts routinely turn to dictionaries." *DePasquale v. Nationwide Mut. Ins. Co.*, No. 21-3467, 2022 WL 1017956, at *4 (6th Cir. Apr. 5, 2022) (quoting *Textileather Corp. v. GenCorp. Inc.*, 697 F.3d 378, 382 (6th Cir. 2012)).

When a contract is fully integrated, the parol evidence rule bars a party from varying, contradicting, or supplementing the contract with "evidence of prior or contemporaneous oral agreements, or prior written agreements." *Galmish v. Cicchini*, 734 N.E.2d 782, 788 (Ohio 2000) (citing 11 Williston on Contracts (4 Ed. 1999) 569–70, Section 33:4). A fully integrated contract is the "full expression of the parties' agreement, so that all earlier agreements are superseded . . . ." *PNC Bank, N.A. v. Springboro Med. Arts, Inc.*, 41 N.E.3d 145, 150 (Ohio Ct. App. 2015) (quotation marks and citation omitted). If an integration is complete, then it fully expresses the parties' intentions, and parol evidence (or extrinsic evidence) is not admissible. *Id.* Thus, when a later writing "is complete and unambiguous on its face, parol evidence is inadmissible to show a contrary intent of the parties." *Bush Truck Leasing, Inc. v. All Ways Auto Transport, LLC*,

Case No. 1:20-cv-511, 2021 WL 3173073, at *3 (S.D. Ohio July 26, 2021) (quoting *TRINOVA Corp. v. Pilkington Bros., P.L.C.*, 638 N.E.2d 572, 575 (Ohio 1994)).

When a contract is only partially integrated, then it does not fully express the parties' intent, and such evidence is "admissible to clear up ambiguities with respect to the terms that are not integrated." *PNC Bank*, 41 N.E.3d at 150. However, extrinsic evidence may be used "to supplement. . . but not vary or contradict the terms" of a partially integrated written agreement. *Bush Truck*, 2021 WL 3173073, at *4 (quoting *Mishler v. Hale*, 26 N.E.3d 1260, 1270 (Ohio Ct. App. 2014)).

Because the IC Agreement was the last executed contract and contains an integration clause, the Court begins with the IC Agreement.

The refund payment provision of the IC Agreement reads:

> **Refund Payment.** If this Agreement is cancelled on or before **March 31, 2019**, [Plaintiff] shall be eligible to receive a Refund Payment of eighty percent (80%) of all monies paid to Nationwide for the Reimbursement pursuant to Agent's . . . RAE Agreement.

IC Agmt. ¶ 12, ECF No. 1-5 (emphasis in original).

Both parties agree this paragraph of the IC Agreement entitles Plaintiff to a refund payment of 80% of the amount he paid for the "Reimbursement pursuant to Agent's RAE Agreement." Additionally, because the IC Agreement designates James L. Rouse Jr. as the "Agent," this paragraph clearly refers to Plaintiff's RAE Agreement. IC Agmt. Preface, ECF No 1-5. The parties dispute what the IC

Agreement means by Reimbursement pursuant to Agent's RAE Agreement. Accordingly, the Court must determine what this phrase means.

Nationwide argues that the IC Agreement's reference to the RAE Agreement means the Court should look only to the document titled "RAE Agreement" (as amended). Mot. 9–10, ECF No. 29. Nationwide argues that document—and only that document—constitutes "Plaintiff's RAE Agreement." *Id.* Because the document titled RAE Agreement (even as amended) mentions Reimbursement for only the Bennetti Policies, Nationwide contends Plaintiff's refund payment is limited to only 80% of the money Plaintiff paid toward the Bennetti Policies.

Plaintiff argues that the PASA Agreement *is* part of the RAE Agreement. Resp. 9–12, ECF No. 32. Plaintiff's argument proceeds as follows. The PASA Agreement referred to itself as an "adjunct" to the RAE Agreement. An "adjunct" to something is, by definition, a part of that thing. Thus, according to Plaintiff, the PASA Agreement is part of the RAE Agreement. *Id.*

So, Plaintiff continues, the IC Agreement's reference to the "Reimbursement pursuant to [Plaintiff's RAE Agreement]," covers both the Reimbursement in the document entitled "RAE Agreement" and the Reimbursement in the PASA Agreement. *Id.* Plaintiff argues that to hold otherwise would be overly formalistic and would not give effect to the intent of the parties. *Id.* At the very least, Plaintiff argues that the reference to "Plaintiff's

RAE Agreement" in the IC Agreement is ambiguous and, as such, judgment on the pleadings is inappropriate. *Id.* at 13–14.

For the following reasons, the Court agrees with Plaintiff.

Both Plaintiff and Nationwide seem to agree that the document signed in 2011 titled RAE Agreement and the other document signed in 2011 titled RAE Amendment are part of Plaintiff's RAE Agreement. The parties disagree as to whether the 2013 document titled PASA Agreement is also part of Plaintiff's RAE Agreement. Before looking to the PASA to determine whether it is also part of Plaintiff's RAE Agreement, the Court must consider whether it is barred from doing so by the parol evidence rule.

In considering this issue, the Court must determine whether the IC Agreement is a fully or partially integrated agreement.[1] The Court concludes that the IC Agreement is partially integrated because the language used by the parties in the IC Agreement reflects a need to reference prior written agreements to ascertain the parties' intent vis-à-vis the IC Agreement. *Cf. Bush Truck*, 2021 WL 3173073, at *4 (concluding that a contract was fully integrated because the language did not reflect a need to reference prior written agreements between the parties); *Pate v. Quick Solutions, Inc.*, No. 10AP-767, 2011 WL 3449619, at *8 (Ohio Ct. App. 2011) (concluding that a court may look to extrinsic evidence

---

[1] The Integration Clause provides that "[t]he terms and conditions contained in [the IC Agreement] supersede all prior oral or written understandings and agreements between [Plaintiff and Nationwide Insurance] and constitute the entire agreement between them concerning the subject matter of this Agreement." IC Agmt., ¶ 25, ECF No. 1-5.

when an agreement referenced a set of guidelines, but those guidelines were omitted from the agreement). Indeed, the provision of the IC Agreement at the heart of this dispute clearly references a prior written agreement between the parties. Accordingly, the parol evidence rule does not bar the Court's consideration of the PASA Agreement in determining what the term Reimbursement pursuant to Agent's RAE Agreement means in the IC Agreement.

The first page of the PASA Agreement plainly states that it is an "adjunct" to the RAE Agreement. PASA Agmt. pg. 1, ECF No. 1-4. The term "adjunct" is not defined by the parties, nor does it seem to have a specialized meaning under Ohio contract law. Indeed, the parties point to no case law analyzing what an "adjunct" to an earlier contract means under Ohio law, and the Court likewise finds none. Because "adjunct" does not appear to have a specialized meaning in this context, Ohio law instructs that the word be given its ordinary meaning. *Foster*, 678 N.E. 2d at 526. Resorting to dictionary definitions is appropriate under Ohio law to determine a word's ordinary meaning. *DePasquale*, 2022 WL 1017956, at *4.

Black's Law Dictionary defines "adjunction" as "the act of including one matter in another matter or the accession or addition of something." Black's Law Dictionary, ADJUNCTION, https://thelawdictionary.org/adjunction/, last accessed Feb. 6, 2023. The Merriam-Webster Dictionary defines "adjunct" as "something joined or added to another thing, but not essentially a part of it." Merriam-

Webster Dictionary, adjunct, https://www.merriam-webster.com/dictionary/adjunct, last accessed Feb. 6, 2023. The Cambridge English Dictionary defines "adjunct" as "something added or connected to a larger or more important thing." Cambridge Eng. Dictionary, adjunct, https://dictionary.cambridge.org/us/dictionary/english/adjunct, last accessed Feb. 6, 2023. Finally, the Oxford English Dictionary defines "adjunct" as "associated, connected; joined, added; subordinary, supplementary," and "something which is joined or connected to something else and auxiliary to or dependent upon it." Oxford Eng. Dictionary, adjunct, https://www.oed.com/view/Entry/2464?redirectedFrom=adjunct#eid, last accessed Feb. 13, 2023. Given these definitions, a later agreement that is an "adjunct" to an earlier agreement plainly becomes part of the earlier agreement. So, Plaintiff is right. The PASA Agreement is part of Plaintiff's RAE Agreement.

Next, the Court must determine what constitutes the "Reimbursement." Reading the whole of Plaintiff's RAE Agreement which, as addressed above, includes the PASA Agreement, there are two "Reimbursements." The first is $244,960 for the right to service the Bennetti Policies. RAE Amend. ¶ 13, ECF No. 1-3. The second is $178,627.62 for the right to service the Parsons Policies. PASA Agmt. Article 2, pg. 2, ECF No. 1-4. So, the "Reimbursement pursuant to [Plaintiff's RAE Agreement]" means both the Reimbursement for the right to service the Bennetti Policies and the Reimbursement for the right to service the Parsons Policies. Accordingly, because the IC Agreement was cancelled on or

before March 31, 2019, Plaintiff is eligible to receive a Refund Payment of 80% of all monies paid to Nationwide for the Reimbursement values of both the Bennetti and the Parsons Policies. *See* IC Agmt. ¶ 31, ECF No. 1-5.

Because Nationwide's reading is incorrect, its motion for judgment on the pleadings as to Plaintiff's breach of contract claim and its counterclaim for declaratory judgment that it properly calculated Plaintiff's refund payment, paid Plaintiff the same, and does not owe Plaintiff any additional payments, must be **DENIED**.

## B. Attorneys' Fees

Nationwide also moves for judgment on the pleadings on its counterclaim for attorneys' fees in this action. Mot. 12, ECF No. 29; Ans. ¶¶ 29–31, ECF No. 21. Nationwide cites the attorneys' fees provision of the IC Agreement, which reads:

> **Attorneys' Fees.** In the event that Nationwide is successful in any suit or proceeding brought or instituted by Nationwide to enforce any of the provisions of this Agreement or on account of any damages sustained by Nationwide by reason of the violation by Agent of the terms and/or by provisions of this Agreement, Agent agrees to pay to Nationwide such reasonable attorneys' fees as are permitted by statute and/or fixed by the court.

IC Agmt. ¶ 31, ECF No. 1-5.

Any award of attorneys' fees is inappropriate because Nationwide has not been successful. Thus, Nationwide's motion for judgment on the pleadings as to its counterclaim for attorneys' fees is **DENIED**. Further, although Plaintiff's reading of the at-issue contract is correct, because the Court has not yet entered

judgment in Plaintiff's favor, his cross-motion for judgment on the pleadings as Nationwide's counterclaim for attorneys' fees is **DENIED** as premature.

### IV. CONCLUSION

In summary, Nationwide's motion for judgment on the pleadings as to Plaintiff's breach of contract claim and Nationwide's counterclaim for declaratory judgment as to Plaintiff's breach of contract claim are both **DENIED**. Further, Nationwide's motion for judgment on the pleadings as to its counterclaim for attorneys' fees is **DENIED**. Plaintiff's cross-motion for judgment on the pleadings as to Nationwide's counterclaim for attorneys' fees is likewise **DENIED**. Because Plaintiff's reading of the IC Agreement is the correct reading and Plaintiff did not cross-move for judgment on the pleadings as to his breach of contract claim, the Parties are **ORDERED** to file a joint notice on the docket within **TWENTY-ONE DAYS** as to the appropriate next steps in this case.

The Clerk shall terminate ECF No. 29.

**IT IS SO ORDERED.**

*/s/ Michael H. Watson*
**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**